# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos.  08-1441/1488

_____

Yankton Sioux Tribe, and its individual
members,

      Plaintiffs–Appellees/
      Cross-Appellants,

United States of America, on its own
behalf and for the benefit of the
Yankton Sioux Tribe,

      Intervenor Plaintiff–Appellee,

      v.

Scott J. Podhradsky, State's Attorney
of Charles Mix County; C. Red Allen,
member of the Charles Mix, South
Dakota, County Commission; Keith
Mushitz, member of the Charles Mix,
South Dakota, County Commission;
Sharon Drapeau, member of the Charles
Mix, South Dakota, County
Commission; M. Michael Rounds,
Governor of South Dakota; Lawrence
E. Long, Attorney General of South
Dakota,

      Defendants–Appellants/
      Cross-Appellees,

Appeals from the United States
District Court for the
District of South Dakota.

Southern Missouri Waste Management     *
District,                              *
                                       *
        Interested Party.              *


-------------
Rosebud Sioux Tribe,                   *
                                       *
        Amicus on behalf of Appellees. *
                                    _____

                        Submitted:  March 11, 2009
                            Filed:  August 25, 2009
                                    _____

Before MURPHY, MELLOY, and SHEPHERD, Circuit Judges.
                                    _____

MURPHY, Circuit Judge.

        In this action the Yankton Sioux Tribe (Tribe) and its members sought declaratory and injunctive relief against officials of Charles Mix County[1] and the State of South Dakota[2] in respect to the boundaries of the Yankton Sioux Reservation. In an earlier stage of the case we held that the Tribe's 1894 cession of certain land to the United States had diminished, rather than disestablished, the reservation and that some land retained reservation status. Yankton Sioux Tribe v. Gaffey (Gaffey II), 188 F.3d 1010 (8th Cir. 1999), cert. denied, 530 U.S. 1261 (2000). We remanded to the district court for further development of the record and for "findings relative to the status of Indian lands which are held in trust." Gaffey II, 188 F.3d at 1030.

_____

        [1]Scott Podhradsky, state's attorney for Charles Mix County, and individual members of the county commission. During the course of this consolidated litigation, Podhradsky replaced Matt Gaffey as state's attorney and first named defendant.

        [2]Governor Michael Rounds and Attorney General Lawrence Long.

An earlier action had been filed by the Tribe against the Southern Missouri Waste Management District (Waste District), seeking a declaration that the 1858 boundaries of the reservation remained intact and that therefore a particular site at issue was subject to federal environmental regulation. After the Tribe prevailed in the district court and on appeal, Yankton Sioux Tribe v. S. Mo. Waste Mgmt. Dist., 890 F. Supp. 878 (D.S.D. 1995), aff'd, 99 F.3d 1439 (8th Cir. 1996), the Supreme Court reversed. In South Dakota v. Yankton Sioux Tribe, 522 U.S. 329 (1998), the Supreme Court held that the Yankton Sioux Reservation had been diminished by the Tribe's cession of certain lands to the United States in 1894 and that the parcel at issue in the Tribe's dispute with the Waste District was not reservation land.[3] The Court remanded for determination of the larger question of whether the Yankton Sioux Reservation had been disestablished or diminished.

On remand the original case was consolidated with this separate action against the county and state officials in which the Tribe seeks a declaratory judgment that all land not ceded to the United States in 1894 remains part of the Yankton Sioux Reservation under the jurisdiction of the Tribe and the federal government. The United States intervened on its own behalf and for the benefit of the Tribe. The district court ruled in favor of the Tribe, concluding that the reservation had not been disestablished but consisted of all land not ceded in 1894 as well as certain reserved "agency trust lands." Yankton Sioux Tribe v. Gaffey (Gaffey I), 14 F. Supp. 2d 1135 (D.S.D. 1998). The defendants appealed, and we affirmed in part, reversed in part, and remanded for further proceedings, Gaffey II, 188 F.3d at 1030-31, holding that the reservation had been diminished rather than disestablished and that it included at least the agency trust lands, but reversing and remanding in other respects.

_____

[3]The Tribe has never dismissed its action against the Waste District which remains an inactive interested party, not having filed a notice of appeal. The district court observed that district representatives were present during the Podhradsky trial but had not played an active role after October 2004.

Now before our court are appeals filed by both sides from the judgment issued by the district court after additional proceedings on remand, Yankton Sioux Tribe v. Podhradsky, 529 F. Supp. 2d 1040 (D.S.D. 2007). The district court ruled that some 37,600 acres of trust land remained part of the reservation and that land continuously owned in fee by individual Indians also qualified as reservation. The county and state defendants appeal, and the Tribe, supported by the intervening United States, cross appeals. We affirm in part and vacate in part.

I.

The original boundaries of the Yankton Sioux Reservation were created by treaty between the Tribe and the United States on April 19, 1858, 11 Stat. 743 (1858 Treaty). In that treaty, the Tribe ceded more than 11,000,000 acres of land to the United States and reserved to itself approximately 430,400[4] acres in what is now Charles Mix County, South Dakota. The United States guaranteed to the Tribe "the quiet and peaceable possession of the said tract," 11 Stat. at 744, and agreed that, with certain exceptions, "[n]o white person . . . shall be permitted to reside or make any settlement upon any part of the tract herein reserved for said Indians," 11 Stat. at 747. The subsequent history of the Tribe and its reservation reflects the changing policies of the federal government over the succeeding years.

In the first half of the nineteenth century, federal Indian policy focused on removing tribes from the eastern half of the country and relocating them on western lands, but by the time of the 1858 Treaty, "federal policy had shifted fully from removal to concentration on fixed reservations." Cohen's Handbook of Federal Indian

---

[4]Although the 1858 Treaty refers to 400,000 acres, a later survey concluded the reservation contained 430,405 acres at the time of the treaty. See Letter from the Commissioner of Indian Affairs to the Secretary of the Interior (Dec. 9, 1893), reprinted in S. Exec. Doc. No. 27, 53d Cong., 2d Sess., 1, 5 (1894) (Commissioner's Letter).

Law § 1.03[6][a], at 65 (2005 ed.) (Cohen). These reservations were "envisioned as schools for civilization, in which Indians under the control of the agent would be groomed for assimilation." Id.

As the westward migration of white settlers accelerated following the Civil War, pressure grew to open Indian reservations for agricultural and resource development by the newcomers. Supporters of Indian assimilation argued that as more Indians adopted white customs and agricultural practices, their need for large tracts of reservation land would diminish, freeing vast areas for white settlement and development. This approach was formalized in the General Allotment Act of 1887 (Dawes Act), ch. 119, 24 Stat. 388 (repealed in part by Pub. L. No. 106-462 § 106, 114 Stat. 1991, 2007 (2000)).

Under the Dawes Act, the executive branch was authorized to divide portions of Indian reservations into personally assigned allotments to be distributed to individual tribal members. Id. § 1, 24 Stat. at 388. The Secretary of the Interior was directed to issue patents, under which the United States would hold title to the allotments in trust for twenty five years "for the sole use and benefit of the Indian to whom such allotment shall have been made." Id. § 5, 24 Stat. at 389. At the end of the trust period, allottees would take fee simple ownership of their individual plots, free of any restrictions against sale or alienation to non Indians. Id. Furthermore, once a reservation had been divided into allotments, the government was empowered to negotiate with the tribes for the purchase of unallotted surplus land and to open such areas to white settlement. Id.

The allotment policy in general and the Dawes Act in particular were intended to hasten the demise of the reservation system and to encourage Indian assimilation into the white system of private property ownership. "Within a generation or two, it was thought, the tribes would dissolve, their reservations would disappear, and

individual Indians would be absorbed into the larger community of white settlers." Yankton Sioux Tribe, 522 U.S. at 335.

Acting under the authority of the Dawes Act, federal agents allocated to tribal members individual allotments comprising 167,325 acres of the then 430,405 acre Yankton Sioux Reservation. Another 95,000 acres were subsequently allotted to tribal members under the Act of February 28, 1891, 26 Stat. 794 (1891 Act). These tribal allotments, totaling approximately 262,300 acres, were not contiguous parcels of land. Rather, the individual allotments were scattered across the reservation and interspersed with approximately 168,000 acres of unallotted surplus land. Commissioner's Letter at 5.

In 1892 a three member Yankton Indian Commission, which represented the Secretary of the Interior, traveled to the reservation to discuss the federal government's interest in acquiring the Tribe's surplus land. After lengthy negotiations, the Tribe agreed to sell all of the unallotted acreage to the United States for $600,000. The ceded land was then to be opened to white settlement, with the exception of roughly 1,000 acres specifically reserved for use by the United States for "agency, schools, and other purposes." Act of August 15, 1894, ch. 290, 28 Stat. 286, 316 (1894 Act). These set aside agency reserve lands were expected to be opened for white ownership at such time as they were no longer needed for the Tribe's support. Id. The Supreme Court has commented that the set aside of these agency lands is evidence that Congress envisioned an ongoing reservation despite the sale of the surplus lands. Yankton Sioux Tribe, 522 U.S. at 350.

Congress ratified the cession agreement by statute in the 1894 Act, and in May 1895 President Grover Cleveland issued a proclamation opening the ceded land to white settlement. In Yankton Sioux Tribe the Supreme Court ruled that the land ceded to the United States under the 1894 Act was thus no longer part of the Yankton Sioux Reservation but fully subject to the jurisdiction of South Dakota. 522 U.S. at 358. By

the end of the nineteenth century federal Indian policy had therefore reduced the Tribe's land holdings from a sizeable communal reservation to a checkerboard of individual allotments intermingled with white homesteads.

Subsequently Congress passed the Act of May 8, 1906, ch. 2348, 34 Stat. 182 (Burke Act), amending § 6 of the Dawes Act. The Burke Act gave the Secretary of the Interior the discretion to remove allotted land from trust status and to issue fee simple patents, either upon the death of an Indian allottee or upon a finding that an allottee was "competent and capable of managing his or her affairs." 34 Stat. at 183. Upon issuance of fee simple patents, such Indian owned land would then be freely alienable to white settlers. As a result of fee patents issued under the Burke Act, tribal allotments began passing into white hands well before the expiration of the original twenty five year trust period set by the Dawes Act. By 1930, tribal members held only 43,358 acres of land out of the more than 262,300 acres originally carved into Indian allotments.[5] Herbert T. Hoover, A Yankton Sioux Tribal Land History 5 (1995) (unpublished manuscript).

In 1916, recognizing the rapid erosion of the Tribe's allotted lands, President Woodrow Wilson issued an executive order extending by ten years the trust period on all but approximately 150 of the parcels still held in trust on the Yankton Sioux Reservation. Exec. Order No. 2363, Apr. 20, 1916. The trust periods were again extended in 1926 and 1929. Exec. Order No. 4406, Mar. 30, 1926; Exec. Order No.

---

[5]The Tribe argues that the Burke Act did not apply to allotments made on the Yankton Sioux Reservation and that therefore some 300 "forced fee patents" issued under it should be considered null and void. The Tribe did not raise this argument until after the case was before the district court for the third time. As that court noted, "[t]here is . . . a limit as to what should be undertaken . . . to determine reservation boundary issues that were not raised or addressed by this Court nor the superior courts. This issue . . . [is] beyond the scope of this litigation . . . ." Yankton Sioux Tribe v. Gaffey, No. CIV 98-4042, 2006 WL 3703274, at *3 (D.S.D. Dec. 13, 2006) (order identifying the issues to be considered on remand). We agree.

5173, Aug. 9, 1929. In 1929 Congress also reconsidered the disposition of the roughly 1,000 acres of land which had been set aside for "agency, schools, or other purposes." Although the 1894 Act originally envisioned that these lands would be opened to white settlement once they had served their intended purposes, Congress decided instead to return them to the Tribe and specifically precluded any allotments on these parcels. Act of February 13, 1929, ch. 183, 45 Stat. 1167 (1929 Act).

During this period, the consequences of the allotment and assimilation policies became acutely obvious. The process of allotment and the liberalized issuance of fee patents under the Burke Act left many Indians landless and reduced once coherent communities to jurisdictional checkerboards, as is currently reflected in respect to the Yankton Sioux Reservation. Cohen, § 1.04, at 78. Moreover, "[t]he process of transforming Indian culture into white culture proved more difficult than placing an Indian name on allotted land deeds. . . . [T]he cultural resilience of the American Indian amazed even the most dedicated reformer." Id. at 80.

By the early twentieth century, the forces behind allotment and assimilation were nearly exhausted, and federal policy was reoriented towards "new protections for Indian rights, support for federally defined tribalism, and encouragement of historical and anthropological concerns such as arts, crafts, native rituals, tourism, and traditional economic systems." Id. § 1.05, at 84. In time this new attitude led to the Indian Reorganization Act of 1934 (IRA), ch. 576, 48 Stat. 984 (codified as amended at 25 U.S.C. § 461 et seq.).

The IRA reflected a fundamental change in federal Indian policy. It prohibited further allotment of Indian lands and indefinitely extended the trust periods for outstanding allotments. The Act also authorized the Secretary of the Interior to acquire additional lands in trust—both on and off reservation—and either to proclaim these lands part of a new reservation or to add them to an existing one. Since the

passage of the IRA, the government has taken almost 6,500 acres into trust for the benefit of the Yankton Sioux Tribe.

This tangled history, along with the inconsistent and sometimes contradictory policies pursued by the national government, has produced a confusing patchwork of land holdings and jurisdictional claims within the original 1858 boundaries of the reservation. For ease of exposition, we have identified six general categories of land.

> (1) Allotted Trust Lands: lands allotted to members of the Tribe which have been continuously held in trust for the benefit of the Tribe or its members. This category includes allotments which were later transferred from individual to tribal control, so long as the trust status was maintained. The district court found 30,051.66 acres of land fit this description.[6]

> (2) Agency Trust Lands: lands ceded to the United States in the 1894 Act but reserved for "agency, schools, and other purposes" which then were returned to the Tribe according to the 1929 Act. The district court identified 913.83 acres of land within this category. We held this category of land to be part of the diminished Yankton Sioux Reservation in Gaffey II. 188 F.3d at 1030.

> (3) IRA Trust Lands: lands acquired by the United States in trust for the benefit of the Tribe pursuant to the IRA. The district court identified 6,444.47 acres of such land.

> (4) Miscellaneous Trust Lands: lands acquired by the United States in trust for the benefit of the Tribe other than pursuant to the IRA. Approximately 174.57 acres fit within this category.

---

[6]In Yankton Sioux Tribe the Supreme Court mentioned 30,000 acres held in trust for individual Indians and 6,000 acres of "tribal lands." 522 U.S. at 796.

(5) <u>Indian Fee Lands</u>: allotted lands later transferred in fee to individual Indians and which have never passed out of Indian ownership. The record does not identify lands which may fit this description.

(6) <u>Non Indian Fee Lands</u>: lands ceded to the United States in the 1894 Act and subsequently opened to white settlement which have not been reacquired in trust; and nonceded lands originally allotted to tribal members but later transferred in fee to non Indians and never reacquired in trust.

Of these six categories, the first four may be generically referred to as "trust lands" and the last two as "fee lands."

The trust lands are spread across the site of the original 1858 reservation in a complex checkerboard pattern, intermingled with lands long since occupied by white homesteaders. As a result the Yankton Sioux trust lands are not neatly contained within a single continuous boundary. The defendants urge that this characteristic shows the reservation has ceased to exist, but they cite no authority which requires that a reservation consist of compact, contiguous lands. While the fractured configuration of the Yankton Sioux Reservation may not seem ideal to various parties, it is a historic artifact resulting from shifting federal policy. There was evidence at trial that the parties have long experience in dealing with this historical reality. For example, defendant Scott Podhradsky, state's attorney for Charles Mix County, testified that local and federal officials have developed a respectful and productive working relationship despite the complex jurisdictional boundaries.

In short, the 11,000,000 acre domain once assigned to the Tribe was successively fragmented and dramatically reduced in size: first to roughly 430,400 acres in 1858 and then to 262,300 acres in 1894. The issues now before us include the status of some 37,600 acres held in trust. Whatever the size of the remaining reservation lands, there is evidence in the record that they have continuing relevance

and importance to the Yankton Sioux Tribe as a touchstone linking tribal members with each other and with their common culture, history, and heritage.

## II.

In September 1994 the Yankton Sioux Tribe commenced its civil action against the Waste District seeking to prove that the site of a proposed landfill was in fact located on the Yankton Sioux Reservation and was therefore subject to federal environmental regulations. The Waste District filed a third party complaint and added the State of South Dakota as a party. In 1995 the district court decided that the original reservation boundaries as established by the 1858 Treaty remained in force. Yankton Sioux Tribe v. S. Mo. Waste Mgmt. Dist., 890 F. Supp. 878 (D.S.D. 1995), aff'd, 99 F.3d 1439 (8th Cir. 1996).

The Supreme Court reversed, holding that all lands which had been ceded to the United States pursuant to the 1894 Act had thereby lost reservation status and were returned to the public domain. The Court specifically reserved the question of whether the 1894 Act had disestablished the entire reservation or whether a diminished reservation continued to exist within the nonceded lands. South Dakota v. Yankton Sioux Tribe, 522 U.S. 329 (1998). It also observed that the Act's special treatment of the reserved agency trust lands was an indication that Congress intended some sort of continuing reservation. Id. at 350. The case was then returned to our court, and we remanded to the district court for further proceedings. Yankton Sioux Tribe v. S. Mo. Waste Mgmt. Dist., 141 F.3d 798, 799 (1998).

On remand the district court consolidated the original case against the Waste District with this separate civil action brought by the Tribe against various state and county officials seeking injunctive and declaratory relief. The Tribe asserted that the Yankton Sioux Reservation had been diminished only by those lands ceded in the 1894 Act and that all other lands within the 1858 boundaries—that is, the 262,300

-11-

acres comprising the original allotted trust lands—remained part of the reservation regardless of their later disposition. The Tribe argued that such lands were therefore within the jurisdiction of the Tribe and the federal government. The United States successfully intervened on behalf of the Tribe. After considering the parties' arguments, the district court held in favor of the Tribe and the government and declared that the Yankton Sioux Reservation continued to exist and consisted of the agency trust lands in addition to all other lands which had not been ceded in the 1894 Act. Yankton Sioux Tribe v. Gaffey (Gaffey I), 14 F. Supp. 2d 1135 (D.S.D. 1998).

The defendants appealed, and this court affirmed in part, reversed in part, and remanded. Yankton Sioux Tribe v. Gaffey (Gaffey II), 188 F.3d 1010 (8th Cir. 1999), cert. denied, 530 U.S. 1261 (2000). After examining the arguments of the parties and the record they had made, we held that the Yankton Sioux Reservation had not been disestablished by the cession of surplus lands or by other means. We also held that the reservation consisted of, at a bare minimum, those lands reserved by the 1894 Act to the United States for "agency, schools, and other purposes" and which had been subsequently returned to the Tribe by the 1929 Act. We reversed the judgment of the district court that all of the originally allotted lands continued to be part of the reservation. We concluded that those allotments which had passed out of Indian hands and into white ownership had ceased to be part of the reservation. Since the existing record was inadequate to determine the status of either the remaining trust lands or any fee lands owned by individual Indians, a remand was necessary. The remaining trust lands were comprised of allotments continuously held in trust for the Tribe or its members, as well as lands later taken into trust by the United States for the benefit of the Tribe including those acquired pursuant to the 1934 Indian Reorganization Act.

In sum, in Gaffey II we held that the Yankton Sioux Reservation had not been disestablished but diminished, and that it consisted of at least the agency trust lands but did not include lands which had passed into white ownership. We remanded to

the district court with instructions to develop the record and make findings relevant to the status of the remaining categories of land. All parties petitioned for en banc review, which was denied. Yankton Sioux Tribe v. Gaffey, No. 98-3894 (8th Cir. Dec. 8, 1999) (order denying petition for rehearing with petition for rehearing en banc). The Supreme Court denied certiorari. Yankton Sioux Tribe v. Gaffey, 530 U.S. 1261 (2000).

On remand the parties conducted additional discovery, after which the district court conducted a two day trial and considered a voluminous set of historical documents and government reports, along with numerous spreadsheets and area maps relevant to the various land holdings in dispute. The district court then made findings of fact and conclusions of law, settling all the contested issues about reservation status in favor of the Tribe. The district court began by recognizing our Gaffey II holding, including that the agency trust lands which had been returned to the Tribe were part of a diminished Yankton Sioux Reservation. The district court then determined that all outstanding allotments which had maintained their trust status—whether for the benefit of the Tribe in common or for individual members—continued to be part of the reservation. Next, the district court held that all lands taken into trust pursuant to the IRA were reservation land; the district court determined alternatively that this category of trust lands is at a minimum "de facto" reservation or a "dependent Indian community" subject to federal and tribal jurisdiction. Finally, the district court ruled that former allotments which were now owned in fee by tribal members were part of the reservation so long as such lands had never passed out of Indian ownership.

The district court also made several ancillary rulings. In particular, it held that, notwithstanding the Tribe's contrary assertion, a 1927 congressional enactment had not frozen the boundaries of the reservation. It further held that the 1934 IRA had frozen the boundaries, but that a subsequent 1948 measure ended that freeze. The district court also rejected a claim by the defendants that 3,201 acres of land allegedly taken into trust by the United States for the benefit of the Tribe were never formally

-13-

accepted into trust status and therefore cannot be considered trust lands or reservation. The district court held that such a challenge to the trust status of the lands was barred by the United States' sovereign immunity and that such immunity had not been waived by the Quiet Title Act, 28 U.S.C. § 2409a.

The distict court's final judgment decreed that the agency trust lands, outstanding allotments, IRA trust lands, and Indian owned fee lands continuously held in Indian hands qualified as reservation. It denied all other claims asserted by the parties. The final judgment did not incorporate the district court's alternative holdings, and it is from that judgment that appellants and cross appellants have taken their appeals.

On their appeal, the defendants challenge the district court's conclusions that the various trust lands are part of the Yankton Sioux Reservation, either formally or informally, or that such lands support a dependent Indian community. They also persist in asking us to reconsider Gaffey II and continue to argue, contrary to that decision, that the reservation has been completely disestablished and that even the agency trust lands lack reservation status. Finally, they contend that the district court erred in not considering their claim that the United States had failed formally to accept certain lands into trust. On its cross appeal, the Tribe objects to the district court ruling that the reservation boundaries are not frozen. The United States asks us to affirm the district court decision in its entirety. We review the findings of fact made by the district court in a bench trial for clear error and review de novo its legal conclusions and mixed questions of law and fact. Eckert v. Titan Tire Corp., 514 F.3d 801, 804 (8th Cir. 2008).

III.

Before we turn to review of the district court's findings and conclusions on remand, we must take up several preliminary issues raised there and arguedagainonappeal. First among these is the defendants' continuing challenge to our holding in Gaffey II that the Yankton Sioux Reservation had not been disestablished.

Gaffey II squarely held that the Yankton Sioux Reservation was never disestablished and that, although diminished, the reservation continues to exist and at a minimum consists of the agency trust lands reserved to the United States for "agency, schools, and other purposes" and later returned to the Tribe. These holdings were part of the law of the case remanded to the district court. The law of the case doctrine means "that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." Gander Mountain Co. v. Cabela's, Inc., 540 F.3d 827, 830 (8th Cir. 2008) (internal quotation marks omitted). The appellants have presented no persuasive reasons to revisit our holding in Gaffey II.

We observed in Gaffey II that the 1894 Act reserved the agency trust lands to the federal government for the purpose of providing "aid and education to tribal members so long as they were needed." Gaffey II, 188 F.3d at 1029. That provision is "strong evidence that a reservation was expected to remain in existence." Id. at 1027. Indeed, the Supreme Court appeared to reach a similar conclusion in Yankton Sioux Tribe, commenting that it would be "'difficult to imagine why Congress would have reserved lands for such purposes if it did not anticipate that the opened area would remain part of the reservation.'" Yankton Sioux Tribe, 522 U.S. at 350 (quoting Solem v. Bartlett, 465 U.S. 463, 474 (1984)). Based on the language of the 1894 Act and the negotiations between the Tribe and federal officials preceding it, we

held in <u>Gaffey II</u> that these lands were part of an ongoing reservation. 188 F.3d at 1030.

Under the law of the case doctrine, "a decision in a prior appeal is followed in later proceedings unless a party introduces substantially different evidence, or the prior decision is clearly erroneous and works a manifest injustice." <u>United States v. Bartsh</u>, 69 F.3d 864, 866 (8th Cir. 1995) (internal quotation marks omitted). The defendants have not met either of these conditions.

The defendants' new evidence introduced at the court trial on remand does not undermine our analysis in <u>Gaffey II</u>. They rely principally on testimony by a former official of the Bureau of Indian Affairs and an agent of the Federal Bureau of Investigation, both of whom said that they personally would exercise jurisdiction over agency trust land only so long as it was held in trust. Because these witnesses based their jurisdiction on the land's trust status as opposed to any reservation status, the defendants argue their testimony undermines the concept of a continuing reservation. According to the trial transcript, these witnesses were never asked whether the agency trust land also qualifies as reservation land, and it is far from clear that their statements reflect a considered jurisdictional distinction between reservation land and various trust properties. More importantly, their testimony sheds little light on the intentions of either the nineteenth century parties who negotiated the agreement between the Tribe and the federal government or of the Secretary of the Interior in making decisions to add trust land to an existing reservation. The defendants also point to evidence that the agency trust lands are located on two distinct parcels and are not contiguous, which is not surprising given the checkerboard nature of the allotments.

It is not clear that any of the defendants' evidence was truly "new" in the sense that it could not have reasonably been developed and presented in earlier stages of this litigation. As another court pointed out in rejecting an attempt to challenge the law

of the case with newly presented evidence, "[t]here is nothing in the record to indicate that the evidence produced at the hearing after remand was unavailable to the [litigants] during the first trial. [They] simply chose not to produce that evidence. They chose their trial strategy, litigated accordingly, and lost." Baumer v. United States, 685 F.2d 1318, 1321 (11th Cir. 1982).

Most significantly, the rulings in Gaffey II have not been shown to be erroneous. They were based on an exhaustive analysis of the historical materials surrounding the Tribe's agreement with the federal government and the 1894 ratification of that agreement, as well as the subsequent history. Gaffey II, 188 F.3d at 1021-28.[7] As already pointed out, the Supreme Court has indicated that the agency trust land provision of the 1894 Act suggests Congress envisioned an ongoing reservation. Yankton Sioux Tribe, 522 U.S. at 350. Clearly the defendants disagree with much of Gaffey II, "but there would be no end to a suit if every obstinate litigant could, by repeated appeals, compel a court to listen to criticisms on their opinions, or speculate of chances from changes in its members." Roberts v. Cooper, 61 U.S. (20 How.) 467, 481 (1857). The law of the case as determined in Gaffey II continues to control this matter, and the district court did not err by following our mandate that the reservation still exists even though diminished and that it includes the agency trust lands.

The defendants also argue that two parcels of the agency trust land, totaling 106 acres, were not within the scope of the 1929 Act which returned the balance of the

---

[7]The defendants rely on Bruguier v. Class, 599 N.W.2d 364 (S.D. 1999), a South Dakota Supreme Court decision released one day after Gaffey II. Bruguier was a habeas case dealing with the criminal jurisdiction status of a former allotment which had passed into white ownership (a category of land which Gaffey II held was not part of a diminished reservation). Bruguier's conclusion that the Yankton Sioux Reservation had been disestablished in 1894 was more sweeping than necessary for resolution of the matter at issue, and none of the parties to this litigation participated in that case.

agency trust lands to the Tribe. These two parcels were conveyed by fee patents to the Chapter of Calvary Cathedral Episcopal Church in 1897 and in 1920. They were thus owned by that church when Congress directed in 1929 that the agency trust lands be returned to the Tribe, rather than be opened for white settlement once they were no longer needed for their intended purposes. The defendants argue that because these 106 acres were in private hands at the time of the 1929 Act, they were not within the Act's purview and are thus outside of Gaffey II's holding that agency trust land "reserved to the federal government . . . and then returned to the Tribe continues  to be a reservation." 188 F.3d at 1030. Whether the 1929 Act would have applied to these lands is moot, for in 1944 and 1945 the church returned these lands to the United States to be held in trust for the Yankton Sioux Tribe. They thus comfortably fit within the holding of Gaffey II and are reservation land under the controlling law of this case.

## IV.

We now turn to the jurisdictional questions at the heart of this case. Reservation land is by definition "Indian country," and as a general rule Indian country falls under the primary civil, criminal, and regulatory jurisdiction of the federal government and the resident Tribe rather than the states. See Alaska v. Native Village of Venetie Tribal Gov't, 522 U.S. 520, 527 n.1 (1998). Reservation status is not the only way to qualify as Indian country. Today the definition of Indian country is found in by 18 U.S.C. § 1151 which was enacted in 1948 and reads in pertinent part as follows:[8]

> [T]he term "Indian country" . . . means **(a)** all land within the limits of
> any Indian reservation under the jurisdiction of the United States

---

[8]Section 1151 was originally enacted to define criminal jurisdiction, but its definition of Indian country is widely recognized to apply to civil matters as well. See Venetie, 522 U.S. at 527.

Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, **(b)** all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and **(c)** all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

Prior to the enactment of § 1151, the evolving concept of Indian country had mainly been developed and refined by the courts in their attempts to stay abreast of changing conditions in the American West and in federal Indian policy. See Cohen, § 3.04[2][b], at 184-88.

Congress reentered the debate in 1948 by adopting § 1151, Act of June 25, 1948, ch. 645, 62 Stat. 683, 757, but the statute mainly codified earlier Supreme Court decisions regarding Indian country. The language in § 1151(b) is taken almost verbatim from the Court's conclusion in United States v. Sandoval, 231 U.S. 28 (1913), that the federal government has a "duty of exercising a fostering care and protection over all dependent Indian communities within its borders, whether within its original territory or territory subsequently acquired, and whether within or without the limits of a State." Id. at 46. Likewise, § 1151(c) affirms the Court's holdings in United States v. Pelican, 232 U.S. 442 (1914), and United States v. Ramsey, 271 U.S. 467 (1926), that allotments constitute Indian country and fall within the jurisdiction of the federal government and the resident tribes.

Section 1151(a) confirms that reservations are properly considered Indian country and are therefore under the primary jurisdiction of the federal government and the relevant tribes. In this sense it is in accord with such cases as Bates v. Clark, 95 U.S. 204 (1877), and Donnelly v. United States, 228 U.S. 243 (1913). However, the enactment of § 1151(a) added an important twist to the nature of reservation land.

According to its terms, reservation land remains Indian country "notwithstanding the issuance of any patent."

Section 1151(a) thus explicitly separates the concept of jurisdiction from the concept of ownership, and in so doing Congress superceded prior case law. For example, Clairmont v. United States, 225 U.S. 551 (1912), had held that land "was Indian country whenever the Indian title had not been extinguished, and it continued to be Indian country so long as the Indians had title to it, and no longer. As soon as they parted with the title, it ceased to be Indian country . . . ." Id. at 558 (quoting Bates, 95 U.S. at 208). Section 1151(a) abrogated this understanding of Indian country and, with respect to reservation lands, preserves federal and tribal jurisdiction even if such lands pass out of Indian ownership. See Seymour v. Superintendent of Wash. State Penitentiary, 368 U.S. 351, 357-58 (1962) (concluding that under § 1151(a) reservation status applies even when land is purchased by a non Indian); see also Solem, 465 U.S. at 468 ("Only in 1948 did Congress uncouple reservation status from Indian ownership . . . .").

A.

Having ruled in Gaffey II that the Yankton Sioux Reservation had not been disestablished, we remanded for the district court to consider, among other matters, the status of allotted trust lands which had retained their trust status. All sides to this litigation acknowledge, as they must, that such lands qualify at the very least as Indian country under § 1151(c), which explicitly identifies allotments as such. The disputed issue is whether these allotments are also part of the Yankton Sioux Reservation and therefore also qualify as Indian country under § 1151(a).

The distinction is important since lands which qualify only under § 1151(c) would lose their Indian country status if their governing trusts were ever terminated or revoked. If these lands also qualify as reservation, however, their Indian country

-20-

status would be considerably more durable. Under § 1151(a) reservation lands retain their status "notwithstanding the issuance of any patent," including a patent which terminated a trust and conveyed the land in fee simple. After considering the evidence at trial, the district court held that the allotments were indeed part of an ongoing reservation and qualified as Indian country under § 1151(a).

The Supreme Court held in Solem that "[o]nce a block of land is set aside for an Indian reservation . . . the entire block retains its reservation status until Congress explicitly indicates otherwise." 465 U.S. at 470. Furthermore, as we noted in Gaffey II, congressional "[i]ntent to diminish or disestablish a reservation must be 'clear and plain.'" 188 F.3d at 1021 (quoting United States v. Dion, 476 U.S. 734, 738 (1986)). While the 1894 Act clearly expressed Congress's intention to sever the ceded surplus lands from the reservation, Yankton Sioux Tribe, 522 U.S. at 357-58, Congress never expressed a similar intention with respect to the allotted lands. The simple act of dividing the Yankton Sioux Reservation into individual allotments was insufficient to divest the allotted lands of their reservation status.

Prior to the expiration of the trust period, the allotted lands "remained Indian lands set apart for Indians under governmental care; and we are unable to find ground for the conclusion that they became other than Indian country through the distribution into separate holdings, the Government retaining control." Pelican, 232 U.S. at 449; see also Mattz v. Arnett, 412 U.S. 481, 496 (1973) (holding that the policy of the Dawes Act "was to continue the reservation system and the trust status of Indian lands"); United States v. Celestine, 215 U.S. 278, 287 (1909) ("It is clear that the allotment alone could not [revoke the reservation]." (quoting Eells v. Ross, 64 F. 417, 419-20 (9th Cir. 1894)). Furthermore, the Tribe's willingness to cede to the United States its unallotted lands does not indicate that the reservation status of allotted lands was also revoked. Yankton Sioux Tribe, 522 U.S. at 356 ("[W]e have repeatedly stated that not every surplus land Act diminished the affected reservation."). More importantly, there is no indication in the historical record that either Congress or the

-21-

Tribe expressly intended to eliminate the reservation status of the Yankton allotted lands immediately upon allotment or upon the sale of the Tribe's surplus holdings.

It is clear from the circumstances surrounding the Tribe's agreement to sell its surplus lands that the Tribe did not intend to relinquish immediate jurisdiction over the allotments and that it would not be required to part with them. In the discussions leading up to the agreement, a government negotiator explained to tribal members that

> [the Great White Father] wants to give you a chance to sell your surplus lands . . . . <u>He has told us to tell you that you will not be forced to part with your lands unless you want to. . . . He does not want you to sell your homes that he has allotted to you. He wants you to keep your homes forever</u>.

Council of the Yankton Indians (Oct. 8, 1892), <u>transcribed in</u> S. Exec. Doc. 27, 53d Cong., 2d Sess., 47, 49 (1894) (emphasis added). These reassurances acquire particular significance in light of the longstanding rule that an agreement between the United States and an Indian tribe should be "construed, not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians." <u>Washington v. Wash. State Commercial Passenger Fishing Vessel Ass'n</u>, 443 U.S. 658, 676 (1979) (quoting <u>Jones v. Meehan</u>, 175 U.S. 1, 11 (1899)).

In their report on the outcome of their negotiations with the Tribe, the federal commissioners wrote that "the purchase of the surplus lands was but a small part of our mission and of minor importance to both the Indians and the Government, the provisions connected therewith for the future welfare of the Indians being of greater importance . . . ." Report of the Yankton Indian Commission (Mar. 31,1893), <u>reprinted in</u> S. Exec. Doc. No. 27, 53d Cong., 2d Sess., 7, 17 (1894). In particular, the Tribe was anxious to insure that annuity payments from the federal government would continue uninterrupted. The historical evidence thus reveals that the Tribe, while

willing to sell its surplus, was concerned with maintaining a presence on the allotted lands and preserving the support of the federal government and its superintendence over those lands.

The final agreement, as ratified in the 1894 Act, reflects this understanding. As already noted, the Act set aside the agency trust land specifically to support the Tribe, a provision which the Supreme Court found "counsels against finding the reservation terminated." Yankton Sioux Tribe, 522 U.S. at 350. Furthermore, the statute ratifying the parties' agreement guaranteed to the Indian allottees the "undisturbed and peaceable possession of their allotted lands" as well as "all the rights and privileges of the tribe." 1894 Act, 28 Stat. at 317.

Simply stated, there is nothing in the historical and documentary record to indicate a congressional intent to terminate the reservation status of the allotted lands immediately upon ratification of the 1894 Act or the opening of the ceded territory to white settlement. In the absence of such an intention, we must conclude that at the time of the Act those lands retained the same reservation status they had enjoyed since the original 1858 Treaty. Even if Congress had foreseen an eventual end to the reservation, one which would perhaps be hastened by the allotment policy,[9] such an expectation would not have been at odds to the nineteenth century mind with the ongoing maintenance of a reservation on the allotted lands. The fact that tribal members maintained beneficial property interests in the allotments is further evidence that the reservation status of those lands was preserved since at the time Indian land ownership was synonymous with reservation status. See, e.g., Solem, 465 U.S. at 468 ( "The notion that reservation status of Indian lands might not be coextensive with tribal ownership was unfamiliar at the turn of the century.").

---

[9]It is worth noting that the eventual expiration of the allotments was never a foregone conclusion. The Dawes Act allowed the president to extend the allotment period, which Presidents Wilson, Coolidge, and Hoover each did. The allotments were then indefinitely extended under the 1934 Indian Reorganization Act.

In the course of setting out the twists and turns in the federal policy regarding tribal lands, Gaffey II recounted Congress's original expectation that allotments would lose their reservation status as they passed out of Indian ownership and into white hands. 188 F.3d at 1028. That original concept was not inconsistent with the maintenance of reservation status for the allotted lands so long as they are held in trust. The defendants claim that because allotments lost their Indian country status when they passed out of Indian hands, they cannot be reservation under § 1151(a) since under that subsection the Indian country status of reservation land is unaffected by ownership. The flaw in the defendants' argument is its attempt to interpret congressional and tribal intentions around 1892 through the modern lens of § 1151. As previously discussed, the 1948 enactment of § 1151(a) introduced a new understanding of Indian country which for the first time separated Indian ownership from reservation status. See Solem, 465 U.S. at 468. As we noted in Gaffey II, this concept "would have . . . been quite foreign" to the parties who negotiated the 1892 agreement between the Tribe and the government, and it is their intentions and not the current statutory regime that "we must look to here." 188 F.3d at 1022.

To summarize, the 1892 agreement, and the 1894 Act which ratified it, expressed no clear congressional intent to divest allotted lands of their reservation status, and in the absence of such intent their reservation status was preserved. During that period, however—and continuing until the 1948 passage of § 1151—prevailing law linked reservation status with Indian ownership. On this basis, we held in Gaffey II that allotments which passed into white hands lost their reservation status. Section 1151 altered the old understanding and gave a previously unimagined durability to reservation land by separating jurisdiction from ownership. Thus, while prior to 1948 an allotment on reservation land would have ceased to be Indian country upon its sale to white owners, that is no longer the case today.[10]

_____

[10]It is unclear from the record whether any allotments have been patented in fee since 1948 and subsequently sold to white owners. If such lands exist, however, they would continue to be Indian country under the clear terms of § 1151(a). The holding

The alleged inconsistency between our holding in <u>Gaffey II</u> (allotments lost reservation status upon sale to whites) and the district court's determination that allotments are reservation under § 1151(a) (reservation status is unaffected by sale) is nothing of the sort. It merely reflects the evolution of federal Indian policy and the defendants' anachronistic attempt to force a nineteenth century agreement into the mold of current legal principles.[11] The district court did not err when it concluded that all outstanding allotted lands continue to be reservation and qualify as Indian country under § 1151(a).

B.

On remand the district court was also asked to consider the status of lands taken into trust by the federal government pursuant to the Indian Reorganization Act. The district court concluded that when lands which were once part of the original 1858 reservation were taken into trust under the IRA, they reacquired reservation status. It identified 6,444.47 acres of such land and classified them as Indian country under § 1151(a). The defendants appeal this holding while the Tribe and the United States support it.[12]

---

in <u>Gaffey II</u> that lands which passed into white ownership lost reservation status thus only applies to pre 1948 conveyances.

[11]As already discussed, the origins of the checkerboard pattern of the Yankton Sioux Reservation lie in the federal government's former allotment policies and its liberal issuance of fee patents under the Burke Act.

[12]The defendants also claim that the United States failed formally to approve some 29 deeds conveying land in trust. These deeds affect approximately half of the IRA trust lands. The defendants argue that since the deeds were recorded without a formal acceptance by the government, the lands conveyed by them are not validly held in trust and cannot qualify as Indian country under any portion of § 1151. As the district court observed, "this case involves jurisdiction issues and does not affect title to real estate." <u>Podhradsky</u>, 529 F. Supp. 2d at 1043. It pointed out that the federal

Congress passed the IRA in 1934, authorizing the Secretary of the Interior "to acquire . . . any interest in lands . . . within or without existing reservations . . . for the purpose of providing land for Indians." IRA § 5, 25 U.S.C. § 465. The purpose of the Act was to further the independence of tribes and strengthen their ability to govern themselves. See Cohen, § 1.05, at 86 (The IRA was meant "to encourage economic development, self-determination, cultural pluralism, and the revival of tribalism."). Its provisions are meant "to stabilize the tribal land base," Nichols v. Rysavy, 809 F.2d 1317, 1323 (8th Cir. 1987), and to that end the legislation was "designed to improve the economic status of Indians by ending the alienation of tribal land and facilitating tribes' acquisition of additional acreage and repurchase of former tribal domains." Cohen, § 1.05, at 86 (emphasis added).

The defendants argue that taking land into trust for the benefit of an Indian tribe is insufficient to convert such land into Indian country, but their position runs contrary to well settled precedent. As the Supreme Court has recognized, "[s]ection 465 provides the proper avenue for [a tribe] to reestablish sovereign authority over territory . . . ." City of Sherrill v. Oneida Indian Nation of N.Y., 544 U.S. 197, 221 (2005). This court has also acknowledged that land held in trust under § 465 is effectively removed from state jurisdiction. In Chase v. McMasters, 573 F.2d 1011 (8th Cir. 1978), we noted that when Congress enacted § 465 "it doubtless intended and understood that the Indians for whom the land was acquired would be able to use the land free from state or local regulation or interference as well as free from taxation." Id. at 1018.[13] See also United States v. Roberts, 185 F.3d 1125, 1131 (10th Cir. 1999)

_____

government's sovereign immunity was not waived by the Quiet Title Act, 28 U.S.C. § 2409a (specifically exempting "trust or restricted Indian lands" from a more general waiver of immunity).

[13]The defendants point to dictum in United States v. Stands, 105 F.3d 1565 (8th Cir. 1997), that "tribal trust land beyond the boundaries of a reservation is ordinarily not Indian country." Id. at 1572. The issue in Stands was whether a particular parcel of land was or was not an allotment; the parties made no argument regarding the

("[L]ands owned by the federal government in trust for Indian tribes [under § 465] are Indian country pursuant to 18 U.S.C. § 1151."); <u>Langley v. Ryder</u>, 778 F.2d 1092, 1095 (5th Cir. 1985) ("[W]hether the lands [acquired pursuant to § 465] are merely held in trust for the Indians or whether the lands have been officially proclaimed a reservation, the lands are clearly Indian country.").

The Tribe and the United States assert that when former reservation land is reacquired in trust under the IRA it is not just Indian country, but a particular <u>type</u> of Indian country, namely reservation within the meaning of § 1151(a). The difference is important because Indian country under § 1151(a) has the distinct property of retaining its status "notwithstanding the issuance of any patent." In other words, such land remains part of the reservation even if sold. The defendants argue, however, that the Yankton IRA trust lands do not qualify as reservation under § 1151(a) because the Secretary of the Interior has not issued a formal proclamation to that effect. They rely on § 7 of the IRA, 25 U.S.C. § 467, which provides that the Secretary "is . . . authorized to proclaim new Indian reservations on lands acquired . . . <u>or</u> to add such lands to existing reservations" (emphasis added).

While there is no doubt that § 467 requires a proclamation when the Secretary wishes to establish a new reservation, the statute does not state that a proclamation is required when the Secretary decides to add land to a preexisting reservation such as that of the Yankton Sioux. Congress left the decision to the Secretary, authorizing the Secretary "to proclaim new Indian reservations . . . <u>or</u> to add such lands to existing reservations." <u>Id.</u> (emphasis added). The statutory language does not itself require a proclamation in the case of preexisting reservations, and the "cardinal canon" of statutory interpretation is "that a legislature says in a statute what it means and means in a statute what it says there." <u>Conn. Nat'l Bank v. Germain</u>, 503 U.S. 249, 253-54

Indian country status of trust lands since that issue was irrelevant. <u>Id.</u> at 1572 n.3. Even so, <u>Stands</u> acknowledged that "[i]n some circumstances, off-reservation tribal trust land may be considered Indian country." <u>Id.</u>

(1992). By taking former Yankton Sioux Reservation lands back into trust under the IRA, the Secretary effectively exercised his authority to consolidate the Tribe's land base by restoring reservation status to former pieces of a reservation in existence since 1858.

When § 467 was drafted in 1934, the concept of Indian country lacked the benefit of § 1151's precise definition. Fine distinctions between reservation land, trust land, allotted land, dependent Indian communities, and the like would have carried little practical weight since jurisdiction was at the time essentially synonymous with Indian ownership. It would therefore have made sense for the congressional drafters of § 467 to provide for the Secretary to distinguish by means of a proclamation between acquisitions of land intended to create a new reservation and acquisitions of land simply to be held in trust. Land held in trust by the federal government for addition to an existing Indian reservation would have been perceived as under federal jurisdiction even without a proclamation.

The IRA "was designed to improve the economic status of Indians by ending the alienation of tribal land and facilitating tribes' acquisition of additional acreage and repurchase of former tribal domains." Cohen, § 1.05, at 86 (emphasis added). Indeed, a principle motivation for the IRA was to "permit progress toward the consolidation of badly checkerboarded Indian reservations." 78 Cong. Rec. 11,730 (1934) (statement of Rep. Howard). In keeping with that legislative intent, the Secretary made the decision to reacquire land in trust which had been formerly recognized as part of an existing reservation, the Yankton Sioux Reservation. This is entirely different from acquisition of land never previously recognized as under Indian jurisdiction. When the Secretary proclaims an intent to reincorporate trust land as a new reservation, it serves to give notice to all of a significant change in condition.

The parties most directly affected by a trust acquisition—the United States as trustee and the Tribe as beneficiary—both agree that the Secretary's decision to take former Yankton Sioux Reservation land into trust was sufficient to restore that land to its previous reservation status. The Secretary has preeminence in interpreting laws under the Department's jurisdiction, Tang v. INS, 223 F.3d 713, 719 (8th Cir. 2000) (according "substantial deference to the agency's interpretation of the statutes and regulations it administers"), and has never seen it necessary to issue a proclamation in respect to the Yankton IRA trust lands despite this extended litigation. The interests of the defendants are protected by administrative procedures in the Department of the Interior in which trust acquisitions are balanced against a multitude of factors, including "[j]urisdictional problems and potential conflicts of land use." 25 C.F.R. § 151.10(f).

The regulations reflect that the acquisition of former reservation land is likely to pose fewer problems than an acquisition of land which has no historical connection to a tribe's land base. Current regulations treat trust acquisitions of former reservation lands as an "on reservation" rather than an "off reservation" transactions, see 25 C.F.R. § 151.2(f) (defining reservation to include "that area of land constituting the former reservation"), and subject them to less searching scrutiny. For example, if a tribe requests an off reservation acquisition—that is, one involving land which is not nor ever has been part of a reservation—the regulations require the Secretary to consider "[t]he location of the land relative to state boundaries, and its distance from the boundaries of the tribe's reservation." 25 C.F.R. § 151.11(b). If off reservation land is being acquired for business purposes, "the tribe shall provide a plan which specifies the anticipated economic benefits." Id. § 151.11(c). Such regulations are consistent with our own analysis that restoration through the IRA of territory historically part of the Yankton Sioux Reservation is distinguishable from the acquisition of lands never within Indian domain and may be accomplished without a proclamation.

Moreover, the defendants can cite no statutory language or case law making an official proclamation necessary before former reservation lands can reacquire their reservation status. The only case they point to involved the establishment of a new reservation, not the return of former reservation land to an existing one, and is thus inapposite. See Citizens Exposing Truth About Casinos v. Kempthorne, 492 F.3d 460 (D.C. Cir. 2007).

The defendants also argue that treating trust acquisitions of former reservation land differently from other acquisitions would grant significance to the 1858 boundaries despite the Supreme Court's determination in Yankton Sioux Tribe, and our own conclusion in Gaffey II, that the original boundaries have been altered by the reservation's diminishment. While it is true that the original 1858 boundaries are no longer markers dividing jurisdiction between the Tribe and the state, that does not mean to say they have lost their historical relevance for the Secretary's discretionary acts. Defendants argue that the IRA's legislative history, the Department of the Interior's internal guidelines, and the Cohen handbook stand for the proposition that some official action beyond the acquisition of land is necessary when adding trust land to an existing reservation.

Here, the lands under consideration were part of this tribe's 1858 reservation and have been reacquired in trust "for the purpose of providing land for Indians." 25 U.S.C. § 465. We believe this presents a distinct question, one which the sources cited by the defendants simply do not resolve. There is a fundamental difference between acquiring land which has no historical connection to an existing reservation and reacquiring land which once formed part of a Tribe's land base. While Congress has provided that an official proclamation by the Secretary is necessary for adding such unrelated land to a reservation, it has not required it for the latter. The district court did not err in its conclusion that all lands taken into trust by the Secretary under § 465 within the jurisdiction of the Yankton Sioux Reservation and qualify as Indian country under § 1151(a).

C.

Although the district court identified 174.57 acres of miscellaneous land acquired in trust other than under the IRA, it did not directly address the status of these miscellaneous lands. Its separate discussion of dependent Indian communities was broad enough to cover all trust properties, however, including the miscellaneous plots.

In <u>Venetie</u> the Supreme Court noted that it had not yet "had an occasion to interpret the term 'dependent Indian communities'" as the term is used in § 1151(b). 522 U.S. at 527. In construing the term for the first time, the Court held that "it refers to a limited category of Indian lands that are neither reservations nor allotments, and that satisfy two requirements—first, they must be set aside by the Federal Government for the use of the Indians as Indian land; second, they must be under federal superintendence." <u>Id.</u>

The miscellaneous trust lands easily meet this definition. The lands were acquired for the use and benefit of the Yankton Sioux Tribe, and the district court found that the federal Bureau of Indian Affairs "negotiates the leases, collects the rents and distributes the rents according to tribal status reports" with respect to these lands. <u>Gaffey I</u>, 529 F. Supp. 2d at 1055. Testimony by a Federal Bureau of Investigation agent confirmed that the federal government exercises criminal jurisdiction over these trust lands. <u>Id.</u> This is more than enough to meet the standard for Indian country under § 1151(b). <u>See, e.g.</u>, <u>Okla. Tax Comm'n v. Citizen Band Potawatomi IndianTribe</u>, 498 U.S. 505, 511 (1991) (concluding that "property . . . held by the Federal Government in trust for the benefit" of a tribe qualifies as Indian country).

The defendants argue that the federal government's administration of these lands in trust is insufficient to meet the Supreme Court's definition of dependent

Indian communities as it was announced and applied in <u>Venetie</u>. That case involved lands held under the Alaska Native Claims Settlement Act (ANCSA), Pub. L. No. 92-203, 85 Stat. 688 (codified as amended at 43 U.S.C. § 1601 <u>et seq.</u>). ANCSA was specifically "intended to avoid a 'lengthy wardship or trusteeship.'" <u>Venetie</u>, 522 U.S. at 533. As the Court observed, ANCSA explicitly eliminated the Venetie Reservation and transferred the lands "to private, state-chartered Native corporations, without any restraints on alienation or significant use restrictions, and with the goal of avoiding 'any permanent racially defined institutions, rights, privileges, or obligations.'" <u>Id.</u> at 532-33. The land at issue in <u>Venetie</u> thus had virtually no resemblance to the Yankton Sioux trust land. Conveyance of the latter remains subject to the Secretary's oversight and approval, and the government continues to hold title to the land in trust, to administer leases on it, and to provide law enforcement services on it.

Consequently, we conclude that the miscellaneous trust lands at issue in this case qualify as dependent Indian communities and are Indian country under § 1151(b).

D.

The Tribe and the United States also urge us to uphold the district court's determination that former allotments which have been continuously held in fee by Indian owners constitute reservation land. The defendants seek reversal.[14]

Although we might assume that such lands exist, the record does not identify any or their relevant histories. We therefore conclude that this issue is not ripe for

---

[14]The defendants maintain that our mandate in <u>Gaffey II</u> limited the district court to an analysis of trust lands. This is incorrect, for we noted that the record then before us was insufficient to address the issue of fee lands continuously held in Indian ownership, 188 F.3d at 1030, and remanded "for further proceedings consistent with this opinion," <u>id.</u> at 1031. There was no explicit or implicit instruction limiting the district court to consideration of trust lands.

resolution. "The ripeness doctrine flows both from the Article III 'cases' and 'controversies' limitations and also from prudential considerations for refusing to exercise jurisdiction." Neb. Pub. Power Dist. v. MidAmerican Energy Co., 234 F.3d 1032, 1037 (8th Cir. 2000). In Nebraska Public Power District, we held that "to resolve an issue lacking factual development simply to avoid a threatened harm would be to favor expedition over just resolution." Id. at 1039.

Here, a number of potentially important facts are missing with respect to Indian owned fee lands continuously held by tribal members. To start, no one has identified which, if any parcels, fit within this category. Moreover, the status of such lands may depend on a number of unknown factors, including whether the lands passed into fee ownership before or after the enactment of § 1151(a)'s provision separating reservation status from ownership, whether the allotments expired at the natural end of the trust period, whether the fee patents were issued at the request of allottees, or whether the fee patents were "forced" on allottees pursuant to the Burke Act. After deciding that this category of land remained reservation, the district court noted that many of these historical facts could be developed by consulting "the land title records maintained by the BIA's Realty Office." Podhradsky, 529 F. Supp. 2d at 1056-57. Such facts are currently absent in the record before us, and general conclusory descriptions do not clarify who can exercise jurisdiction over an area. Without the benefit of a fully developed record on these issues, we decline to consider this question and accordingly vacate that portion of the district court's decision and judgment.

E.

The Tribe further asserts that two Congressional enactments—the Act of March 3, 1927, § 4, ch. 299, 44 Stat. 1347 (codified as amended at 25 U.S.C. § 398d) (1927 Act), and the 1934 IRA—froze the boundaries of the reservation. Consequently, it argues, any lands alienated in fee to whites during the effective period of any such

freeze should be considered part of the reservation. The district court determined, however, that the 1927 Act does not apply to the Yankton Sioux Reservation and that whatever freeze the IRA may have imposed was lifted by the Supervised Sales Act, ch. 293, 62 Stat. 236 (1948) (codified at 25 U.S.C. § 483) (Sales Act). The United States and the defendants ask us to uphold the district court rulings on these issues.

With respect to the 1927 Act, the Tribe maintains that the statute prohibited alterations to the boundaries of any Indian reservation except by act of Congress. The defendants respond that the plain terms of the 1927 Act limit its application to reservations created by executive action rather than by treaty. The district court agreed with the defendants and concluded that the statute was inapplicable in the current dispute.

By the mid nineteenth century, Presidents "had begun to withdraw public lands from sale by executive order for the specific purpose of establishing Indian reservations." Sioux Tribe of Indians v. United States, 316 U.S. 317, 325 (1942). Although there were initial questions about the legitimacy of these "executive order" reservations, any doubts were removed by United States v. Midwest Oil Co., 236 U.S. 459 (1915), in which the Supreme Court held that the President has the power to withdraw lands from the public domain even in the absence of express statutory authority. These executive order reservations are nonetheless distinguishable from those created by treaty or by act of Congress.

The language of the 1927 Act does indeed limit its application to executive order reservations: "[H]ereafter changes in the boundaries of reservations created by Executive order, proclamation, or otherwise for the use and occupation of Indians shall not be made except by Act of Congress . . . ." 44 Stat. at 1347 (emphasis added). The natural meaning of this language is that it applies only to reservations created by the executive branch, whether by executive order, executive proclamation, or other executive action, and Sioux Tribe of Indians recognizes as much. 316 U.S. at 325 n.6

-34-

("In 1927, Congress added a provision that any future changes in the boundaries of <u>executive order reservations</u> should be made by Congress alone." (emphasis added)). The Yankton Sioux Reservation was created by the 1858 Treaty, is not an executive order reservation, and is therefore outside the freeze contemplated by this statute.

The Tribe also argues that the 1934 IRA froze the reservation's boundaries. Section 2 of that act indefinitely extended the trust period for all outstanding allotments, 48 Stat. at 984 (codified at 25 U.S.C. § 462), while § 4 states that "[e]xcept as herein provided, no sale, devise, gift, exchange or other transfer of restricted Indian lands . . . shall be made or approved . . . ." <u>Id.</u> at 985 (codified as amended at 25 U.S.C. § 464). The district court concluded that these provisions effectively froze any further diminishment of the Yankton Sioux Reservation, but it also concluded that the Supervised Sales Act, ch. 293, 62 Stat. 236 (1948) (codified at 25 U.S.C. § 483) (Sales Act), lifted whatever freeze was imposed. <u>See</u> <u>Oglala Sioux Tribe</u>, 708 F.2d at 330-31 (concluding that the Sales Act lifted restrictions).

We have never squarely confronted the effect of the IRA on the Secretary's authority under the Burke Act to issue fee patents to "competent" allottees, thereby removing trust restrictions on the alienation and conveyance of Indian lands. However, in <u>Oglala Sioux Tribe of Pine Ridge Indian Reservation v. Hallett</u>, 708 F.2d 326 (8th Cir. 1983), we assumed without deciding that the IRA had effectively frozen the Secretary's ability to issue fee patents. <u>Id.</u> at 330. In the same case, we also determined that the Sales Act had lifted any such freeze. <u>Id.</u> at 330-31.

The Tribe argues that allotments on the Yankton Sioux Reservation were unaffected by the Sales Act since they had been granted under the Dawes Act and the 1891 Act, not under the IRA. While it is true that by its terms the Sales Act applies to allotments "held . . . under" the IRA, 25 U.S.C. § 483, we concluded in <u>Oglala Sioux Tribe</u> that by extending indefinitely the trust periods of previously awarded allotments, the IRA brought within its protection even allotments awarded prior to its

enactment. 708 F.2d at 331. In other words, the Yankton Sioux allotments, although originally granted under the Dawes Act and the 1891 Act, would have expired but for the IRA's extension of the trust period. That is enough for them to be "held . . . under" the IRA. "[T]he allotments would not be 'held' . . . at all without the Indian Reorganization Act." Id. Since the trust periods on the Yankton allotments would have expired but for the IRA, they are "held" under that statute and any freeze imposed on their conveyance was lifted by the Sales Act.

The Tribe argues that even if the Sales Act did undo an IRA imposed freeze, land conveyances in fee to whites during the effective period of the freeze were improper and should be disregarded for the purpose of defining the reservation's current boundaries. The Tribe's arguments suffer from an insufficient factual record, however. As the district court noted with respect to the Tribe's 1934 freeze claim, "no proper foundation was established for the admission of . . . evidence" indicating that any land would have been affected by such a freeze. Gaffey I, 529 F. Supp. 2d at 1051. We conclude that the Tribe's claim that the reservation boundaries were frozen in 1934 is not ripe for resolution on the record before the court.

V.

In the absence of any clear congressional intent to divest allotted lands on the Yankton Sioux Reservation of their reservation status, those lands retained such status, and all outstanding allotments continue to be reservation under § 1151(a). Furthermore, lands originally part of the Tribe's 1858 reservation regained their status as reservation land under § 1151(a) when acquired in trust under the Indian Reorganization Act. The miscellaneous trust lands, by contrast, qualify as part of a dependent Indian community and are therefore Indian country under § 1151(b). Finally, the record regarding fee lands continuously held by tribal members is not ripe for review.

With respect to the judgment of the district court, we therefore:

(1) affirm insofar as it concluded that the agency trust lands, the outstanding allotments, and the IRA trust lands are part of the Yankton Sioux Reservation and are Indian country under § 1151(a),

(2) affirm its alternative holding that the miscellaneous trust lands constitute a dependent Indian community and are Indian country under § 1151(b),

(3) vacate the district court's holding that fee lands continuously held in Indian ownership are reservation under § 1151(a), and

(4) affirm its denial of all other claims for relief.

_____