# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

———————

No. 09-3896

———————

Falcon Steel, Inc.,                     *
                                        *
              Plaintiff - Appellee,     *
                                        *
                                        *   Appeal from the United States
    v.                                  *   District Court for the
                                        *   Western District of Arkansas.
J. Russell Flowers, Inc.,               *
a Mississippi Corporation,              *
                                        *
              Defendant,                *
                                        *
US Technology Marine Services, LLC,     *
                                        *
              Defendant - Appellant.    *

———————

Submitted: September 21, 2010
Filed:  March 29, 2011

———————

Before BYE, BEAM, and SMITH, Circuit Judges.

———————

SMITH, Circuit Judge.

In this case, Falcon Steel, Inc. ("Falcon") sued US Technology Marine Services, LLC (UST) in state court to enforce a materialman's lien on certain fully and partially constructed barges, alleging that the barges incorporate $376,659.82 worth of steel, for which payment remains due. Following removal to federal court and a bench trial,

the district court[1] found Falcon's lien to be valid under Arkansas state law, and further, that it attaches jointly and severally to all barges at issue. We affirm.

## I. *Background*

UST is a Nevada corporation maintaining its principal place of business in Sebastian County, Arkansas, and specializing in the construction of barges and tugboats. Falcon, a Missouri corporation headquartered in Springfield, Missouri, fabricates and supplies industrial steel. On December 21, 2007, UST agreed to build J. Russell Flowers, Inc.[2] ("Flowers") 20 barges in four-barge increments. Construction was to occur at UST's shipyard in Fort Smith, Arkansas. In turn, UST engaged Falcon to furnish the steel needed to build Flowers's barges. At trial, Falcon's general manager, Jackie Swain, and Falcon's owner and president, Terry Heinz, each testified that Mike Dismer of UST informed them of UST's contract with Flowers and represented that UST sought steel to fulfill its obligations under the Flowers contract. Swain further testified that, to that end, Dismer furnished her with a material list, or "spec sheet," detailing the barges' designs and dimensions as stipulated by Flowers. Swain noted that Falcon understood the steel to be for the Flowers barge projects and that no UST representative ever mentioned that the steel might be utilized for any projects other than Flowers's.

In its defense, UST elicited testimony from both Swain and Heinz that, from the time Falcon agreed to supply UST with steel until the filing of this suit, neither Swain nor Heinz had actually reviewed or was familiar with the details of UST's contract with Flowers. Moreover, Swain and Heinz each admitted that, after shipping commenced, they eventually learned that UST also was building a barge for Canal

---

[1]The Honorable Jimm Larry Hendren, United States District Judge for the Western District of Arkansas.

[2]Flowers was a party to the district court proceedings but has since settled with Falcon and is not a party to this appeal.

Barge Company ("Canal") at the same Fort Smith site where it was completing Flowers's project, and that Canal's barge was being built pursuant to an agreement unrelated to the Flowers contract. Nevertheless, Heinz maintained that, even at the time of Falcon's final shipment to UST, he understood UST to be using Falcon steel only in the construction of Flowers's barges.

UST also offered the testimony of Jeffrey Don Cluck, its former industrial engineer. According to Cluck, UST ordered steel from at least ten to twelve suppliers, depending on price and availability. Cluck testified that, because UST's agreement with Flowers included an "escalation clause" passing on the cost of price spikes in the steel market to Flowers, Cluck kept a logbook tracking which steel was incorporated into the various barges. Based on his logbook, a summary of which UST presented in chart-form at trial, Cluck acknowledged that certain amounts of Falcon steel—roughly $65,000 worth—went into Barges F1 through F5 but maintained that it is impossible for those barges to contain more Falcon steel than his chart reflects.[3] Upon further probing by the district court, Cluck conceded that the chart is not a business record that he regularly maintains but instead is a document he compiled from several different logbooks. Indeed, by Cluck's own admission, the data contained in the chart is largely an extrapolation:

> Q:          Can you describe for the Court all of the documentation that you would have reviewed in order to create this chart?
>
> A [Cluck]:  Well, the main thing I went over was the steel logbook as to when the steel was received at the yard so I know when it would have been used, and then at that particular time, all I had was the Purchase Order number, so I— those were on the chart. And then I used that to add the cost of weight,

---

[3]Presently, UST has either built or partially built six of the twenty barges for which Flowers contracted, and to facilitate review, the parties refer to them sequentially as "Barges F1-F6."

and then once I got the invoice numbers that were in question, I went back and married those into this.

\*\*\*

Q:          Okay. And you have designated [referring to Cluck's chart] that that [particular Falcon] steel was used in Flowers Barge Number 2. Is that right?

A [Cluck]:   Yes.

Q:          How do you know that that was used in only Barge Number 2?

A:          Because that's what we needed at that time for that barge.

Moreover, Cluck admitted that his logbooks are kept solely to account for price escalations in the steel market, not to serve as a means for ascertaining a particular piece of steel's origin, or "whether Falcon steel went into one barge as opposed to another." UST did contend that the purchase orders that it sent to Falcon bore purchase-order numbers followed by the capital letter "F" or "C," purportedly indicating whether the steel was purchased for Flowers's or Canal's project. However, UST's own evidence on this point conflicts. Cluck initially conceded that this was "a recognized *internal* system" being used "at [UST] in order to designate which project it [sic] was being worked on." (emphasis added). But, upon further probing, Cluck testified that UST did not fill out its own purchase orders in their entirety and that Falcon added the numbers along with the "F's" and "C's." Falcon denied knowing of or relying on such a system.

Regardless of what steel went where, Falcon and UST agree that on February 1, 2008, UST submitted a "credit application" to Falcon and that shortly thereafter Falcon began shipping steel to UST on a $100,000 line of credit. Falcon and UST never memorialized a written contract. UST soon exceeded its credit line, and Falcon

-4-

agreed to ship additional steel, subject to a case-by-case determination of UST's creditworthiness. Between February 6, 2008, and April 9, 2008, UST ordered $1,185,948.28 worth of steel from Falcon, and Falcon shipped these orders through May 12, 2008. Some time after May 12, UST ceased paying on its account with Falcon.

Falcon and UST intensely dispute the details surrounding Falcon's final shipment to UST, sent by Falcon on August 29, 2008, and received by UST on September 5, 2008. Still, both parties do agree on three facts. First, Falcon and UST concur that in late August 2008, UST's Ray Williams contacted Heinz to request an additional shipment of steel despite UST's delinquent account. Second, both parties agree that UST—based on an anticipated need for the steel—had previously submitted a purchase order on April 4, 2008, but that, pursuant to industry standard and the two parties's course of dealing, Falcon merely added the material to its inventory and delayed invoicing UST until UST requested delivery. Third, both parties agree that on August 28, 2008, UST wired $65,000 to Falcon and that on the following day, Falcon shipped approximately $58,000 worth of steel to UST.

Falcon and UST's fact versions diverge as to the purpose of this $65,000 payment. According to Swain and Heinz, Heinz and Williams agreed that the $65,000 would not serve as an advance payment for the August 29 shipment but instead would be credited to UST's existing account with Falcon and applied to the oldest unpaid invoices per industry practice. In contrast, Williams testified that he and Heinz agreed that the $65,000 constituted "up[-]front" payment for the steel, plus an additional amount as a good-faith gesture of paying down UST's existing debt.

On September 15, 2008, ten days after UST's receipt of this final shipment of steel, Falcon notified UST of a materialman's lien securing a past-due balance of $476,659.82. On December 10, 2008, Falcon filed its "Account of Materialmen's Lien" in Arkansas state court, and on December 23, 2008, filed suit in the same court

to enforce the lien and collect the debt. Subsequently, UST removed the action to the United States District Court for the Western District of Arkansas.

The district court determined, and neither party disputes, that UST transferred Barge F1 to Flowers, and that "there is and can be no lien against it." Additionally, Falcon and UST concur that on December 30, 2008—seven days after the commencement of suit—Falcon and UST executed a "Partial Release and Assignment," reciting therein that Flowers previously paid $100,000 in exchange for the release of any lien liability as to Barge F2. Accordingly, fully-constructed Barges F3, F4, and F5, as well as partially-constructed Barge F6, are the only barges to which Falcon's asserted lien might attach.

On November 3, 2009, the district court held a day-long bench trial in this matter, and on November 17, 2009, issued its "Memorandum Opinion with Findings of Fact and Conclusions of Law." Therein, the district court found, *inter alia*, the following five facts now relevant to the instant appeal. First, UST did not furnish Falcon with a copy of UST's contract with Flowers, but nevertheless Dismer informed Swain of its existence; consequently Falcon "expected that a number of barges would be built pursuant to it." Second, "[t]he types of steel shipped were the types of steel shown on the materials list for the barges[,]" a list that Dismer provided Swain in their initial meeting. Third, Swain and Heinz's testimonies regarding the final shipment were more credible than Williams's and thus the $65,000 payment was not an advance payment for that final shipment. Fourth, "[n]either Falcon nor UST kept close track of what steel was placed in which barge as construction progressed." Fifth, and finally, UST ordered steel from Falcon and various other suppliers contemporaneously and UST did not purchase steel from Falcon exclusively for use in Flowers' barges but also purchased steel from Falcon for incorporation into Canal's barges.

## II. *Discussion*

On appeal, UST urges this court to reverse the district court's judgment for Falcon on the grounds that (1) Falcon's lien is invalid because it was not timely perfected; or alternatively, (2) even if Falcon's lien is valid, it may not attach jointly and severally to Barges F3 through F6 because Falcon failed to show how much of its steel is incorporated in each barge. We consider each contention in turn.

### A. *The Validity of UST's Lien*

We review the findings of fact made by the district court in a bench trial only for clear error, *Yankton Sioux Tribe v. Podhradsky*, 606 F.3d 994, 1004 (8th Cir. 2010), but review the district court's interpretation of state law de novo, *City of Jefferson City, Mo. v. Cingular Wireless, LLC*, 531 F.3d 595, 599 (8th Cir. 2008). Arkansas state law provides in pertinent part that

> [e]very . . . material supplier . . . who supplies . . . material . . . in the construction or repair of . . . any boat or vessel of any kind, by virtue of a contract with the owner, proprietor, contractor, or subcontractor, or agent thereof, upon complying with the provisions of this subchapter, shall have, to secure payment, a lien upon the improvement . . . ."

Ark. Code Ann. § 18-44-101(a). The materialman's-lien statute adds that "[i]f the improvement is to any boat or vessel, then the lien shall be upon the boat or vessel to secure the payment for labor done or materials . . . furnished." *Id.* § 18-44-101(b).

To acquire a materialman's lien under Arkansas law, suppliers like Falcon must comply with the materialman's-lien statute's perfection procedures. Under those statutory procedures, an uncompensated materialman must "file with the clerk of the circuit court of the county in which the building, erection, or other improvement to be charged with the lien is situated," the following two documents: (1) "[a] just and true account of the demand due or owing to him or her after allowing all credits" and (2) "[a]n affidavit of notice attached to the lien account." *Id.* § 18-44-117(a)(1)(A)-(B).

Finally, and at issue in the instant appeal, the statute sets a limitations period requiring a materialman to file its account and affidavit of notice "within one hundred twenty (120) days after the things specified in this subchapter shall have been furnished or the work or labor done or performed . . . ." *Id.* § 18-44-117(a)(1).

Despite this express limitations period, the Arkansas Supreme Court has carved out a narrow tolling exception to the statutory limitations period, applicable when a materialman furnishes a builder with supplies on an "open" or "running" account. Under this exception, if a materialman (1) begins to furnish supplies

> without any specified agreement as to the amount to be furnished, or the time within which they were to be furnished, and [(2)] there was reasonable expectation that further material would be required of him, and he was afterwards called upon, from time to time, to furnish the same, he should file [the accounting] within 90 days [now, 120 days] after the last item was delivered.

*Kizer Lumber Co. v. Mosely*, 20 S.W. 409, 410 (Ark. 1892) (internal quotations omitted); *see also Streuli v. Wallin-Dickey & Rich Lumber Co.*, 302 S.W.2d 522, 523–24 (Ark. 1957).

In its first issue on appeal, UST asserts that Falcon did not timely perfect its materialman's lien because Falcon failed to file its account within 120 days of the last material furnished on UST's account.[4] Resolution of this issue turns on whether the steel that Falcon delivered on September 5, 2008, was indeed the last material furnished *on UST's account*. As an initial matter, the Arkansas Supreme Court has clarified that the last material is "furnished" upon delivery of the material at or near the construction site, *not* when it is actually incorporated into the structure. *Van*

---

[4]UST claims no other defect in the lien's validity aside from its allegedly untimely perfection.

*Houten Lumber Co. v. Planters' Nat'l Bank of Hughes*, 252 S.W. 614, 615–16 (Ark. 1923). However, UST argues that Falcon's September 5 delivery was not made on UST's existing credit account with Falcon but instead was a one-time shipment of steel for which UST had prepaid a week earlier on August 28 when it wired Falcon $65,000. UST maintains that the last shipment on its account occurred on May 7, 2008, compelling the 120-day filing period to be calculated from that date. As support for this contention, UST cites Williams's testimony that the $65,000 payment was a prepayment for the steel, plus a small payment on its account.

In response, Falcon correctly notes that UST's argument on this point reflects disagreement with the district court's factual characterization of the September 5 shipment as the final shipment on the contract. Under the Arkansas Supreme Court's precedents, whether materials are furnished under an "entire contract" or an "open account"—rather than under separate contracts—is "an exceedingly close question of fact" to be determined by the factfinder. *Burel v. E. Ark. Lumber Co.*, 195 S.W. 378, 379 (Ark. 1917). Accordingly, this court reviews the district court's determination that the September 5 delivery was on UST's open account only for clear error. *See Yankton Sioux Tribe*, 606 F.3d at 1004 (stating that an appellate court may review the factual findings made by a trial judge in a bench trial, only for clear error).

Having heard all of the testimony at trial, and having observed firsthand the witnesses' demeanor, the district court credited Swain's and Heinz's testimony. The court thus found that Williams and Heinz agreed to apply UST's August 28 payment of $65,000 to its oldest invoices per the parties' course of dealing and industry practice. The August 28 payment did not serve as prepayment for the last steel delivery on September 5. The district court found particularly persuasive that UST's own records listed the invoice for the September 5 shipment as "unpaid." Moreover, UST and Falcon agree that they never memorialized a contract outlining how much steel was to be delivered or for how long deliveries were to continue. All of these facts support the district court's conclusion that UST purchased steel on an open account

from Falcon. *See Kizer Lumber Co.*, 20 S.W. at 410 (stating that an open account exists where a materialman: (1) begins to furnish supplies "without any specified agreement as to the amount to be furnished, or the time within which they were to be furnished, and [(2)] there was reasonable expectation that further material would be required of him") (emphasis removed).

The only fact that might weigh in favor of UST's position that the shipment was not on an open account, is the apparent four-month shipping hiatus between May and August. In *Kizer*, the Arkansas Supreme Court stated that a reviewing court, in determining the existence of an open account, ought to consider, among other facts, whether "materials were furnished at short intervals." *Id.* However, this too is a fact that the district court considered. Cluck testified that UST, in accordance with the parties' course of dealing and industry practice, actually ordered the particular steel in question on April 4 in anticipation of future need and with the understanding that Falcon would warehouse the steel at UST's convenience until the need arose. Based on this evidence, the district court concluded that "[t]he length of the interval between shipments, under the circumstances here, is not evidence that a different contract or project had come into play . . . because it is traceable to UST's request that the steel be held for later shipment and to UST's financial difficulties."

Accordingly, we conclude that the district court did not clearly err in finding that Falcon delivered the September 5 shipment on UST's open account. Therefore, Falcon's filing of its account on December 10, 2008, was timely under Arkansas Code Annotated § 18-44-117(a)(1)(A)-(B) because it was within 120 days of the last material furnished on UST's open account. Consequently, Falcon holds a valid materialman's lien under Arkansas state law.

B. *The Extent of UST's Lien*

In its second and final point of error, UST contends that the district court erred when it held that the entire $376,659.82 value of Falcon's materialmen's lien attached

to the remaining four constructed and partially-constructed barges either moored or at dry dock in UST's shipyard. UST grounds this argument on the premise that "[t]he materialmen's[-]lien statutes give a lien only against property that was constructed using the materials furnished by the supplier." *See Central Lumber Co. v. Braddock Land & Granite Co.*, 105 S.W. 583, 584 (Ark. 1907). UST claims that the district court, contrary to this rule, ignored evidence that UST incorporated much of the Falcon steel into the barge being built for Canal, as well as Barge F2, which Falcon agreed to release from any lien liability. Based on its own computations, UST claims that the remaining barges contain only $65,803.52 worth of Falcon steel.

UST's argument states the general rule under Arkansas law that property may be encumbered by a materialman's lien only to the extent of its improvement by the unpaid-for material. *See S. Lumber Co. v. Riley*, 273 S.W.2d 848, 850 (Ark. 1954) ("In order to defeat a lien for material furnished, the owner or other interested party may show that the material was not used in the construction of the building."). However, UST also ignores a critical contour to the rule. In *Central Lumber*, the Arkansas Supreme Court affirmed that "the materials furnished for the building must be *actually used* in its construction or repair before it can become a lien," but tempered this rule with a special burden-shifting framework to be applied in cases such as this one, where a materialman delivers the materials to a builder's construction site but does not confirm their subsequent use. 105 S.W at 584 (emphasis added). Specifically, the court held that if a materialman delivers the material at or near the site of the structure's erection or repair, and the finished structure is composed of materials resembling those delivered, then there is prima facie evidence that the materialman's supplies were actually used, and the burden of rebutting this presumption then shifts to the builder or subsequent owner, their "means of information and opportunities to know such fact being superior." *Id; accord Sebastian Bldg. & Loan Ass'n v. Minten*, 27 S.W.2d 1011, 1015–16 (Ark. 1930) (citing *Van Houten Lumber Co. v. Planters' Nat'l Bank*, 252 S.W. 614, 615–16 (Ark. 1923); *Standard Lumber Co.*, 296 S.W. at 27–28). Moreover, in the event that "the materials were furnished for buildings upon

the same or contiguous lots and under one entire contract," the court resolved that "all such lots would be jointly liable" for the amount due." *Id.* at 584. As the rationale for its rule in *Central Lumber*, the Arkansas Supreme Court explained that "[w]hen materials are furnished under a single contract for buildings to be constructed upon two or more lots, it cannot be expected of the materialman to know how much is used upon each lot." *Burel v. E. Ark. Lumber Co.*, 195 S.W. 378, 379 (Ark. 1917).

As with UST's first issue on appeal, whether Falcon steel was actually incorporated into the barges at issue is a question of fact, and we will reverse the district court's resolution of this question only if we conclude that the district court committed clear error. *Yankton Sioux Tribe*, 606 F.3d at 1004. At trial, UST conceded that the relevant barges are composed of steel of the same dimensions and types that Falcon continuously shipped to UST throughout the spring and summer of 2008. Accordingly, UST now bears the burden of rebutting the presumption that these barges contain (in varying amounts, albeit) the same steel for which approximately $376,000 remains due.

UST relies on Cluck's chart as proof that much of the unpaid-for steel was used in Canal's barge, as well in Barge F2, for which Flowers paid $100,000 to release from any encumbrances. On the other hand, Cluck admitted that his chart is a document that: (1) he does not normally prepare and (2) is based on logbooks not intended to identify a particular piece of steel's origin or end-use. Moreover, the district court found that Cluck created his chart solely for use at trial and that "[n]either Falcon nor UST kept close track of what steel was placed in which barge as construction progressed . . . ." Based on this evidence, the district court did not clearly err when it found that UST failed to rebut the presumption that the barges at issue incorporated Falcon steel.

Finally, UST argues for a de novo standard of review by urging that, as a matter of law, Falcon may not avail itself of *Central Lumber*'s presumption because Falcon

knew that it was furnishing steel to be used for two different projects: Flowers's and Canal's. To UST's credit, the Arkansas Supreme Court has stated that an "attempt to invoke the rule that a lien may be asserted upon two or more lots where materials are furnished under a single contract is without application . . . where it is undisputed that the parties treated each [project] as a separate account and contract." *S. Lumber Co.*, 273 S.W.2d at 850. But here, whether UST and Falcon treated the barges intended for Flowers and Canal as separate is hotly disputed. Moreover, the question of whether Falcon furnished the materials under a single account or two separate accounts is one of fact, *Burel*, 195 S.W. at 379, and the district court did not clearly err in resolving this question. Swain and Heinz testified that UST solicited Falcon's services by specifically referring to the Flowers contract, and Swain further testified that UST's Dismer even furnished her with a copy of the "spec sheet" to guide Falcon in fulfilling UST's steel requirements. The district court found these facts in its memorandum opinion. Trial evidence also reflected that, throughout its dealings with UST, Falcon consistently delivered steel to the Fort Smith shipyard where UST carried on Flowers's and Canal's projects simultaneously.

Here, Falcon shipped steel to the same shipyard, not to two different plants, and substantial evidence indicates that Falcon shipped the steel with the understanding that UST was using it to build Flowers's barges. The only fact that the district court found tending to suggest separate Flowers and Canal accounts is the finding that UST's purchase orders were specially numbered to indicate "which purchases were made on Flowers's account, and which on Canal's account." Critically, the court made no finding as to *who* placed this special numbering system on UST's purchase orders, and, as previously noted, UST's own evidence conflicts on this point. *See supra* Section I. Thus, this one fact—when considered against the balance of contrary evidence—does not render the district court's finding of a single account between UST and Falcon clearly erroneous.

### III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

BYE, Circuit Judge, dissenting in part.

I agree with the majority opinion that the lien is timely, but cannot agree with the majority's determination as to the amount. I do not believe Falcon can encumber the four barges in UST's possession with a lien in the amount of UST's entire liability to Falcon even though Falcon can only prove that the barges collectively contain a fraction of unpaid steel. Because as a lien claimant, Falcon must establish the materials forming a basis for the lien were actually used in the four barges subject to the lien, the amount of Falcon's lien cannot exceed $65,803.52, the amount of Falcon's steel contained in the four barges.

The critical mistake in the majority opinion is the assumption that the dispute between the parties turns on a factual question about the extent of Falcon's steel that went into the four barges in UST's possession. This assumption is incorrect. The reality is that UST has successfully rebutted any presumption of actual use that resulted from Falcon's delivery of steel to UST's shipyard through the testimony of Jeffrey Cluck. See E.C. Barton & Co. v. Neal, 562 S.W.2d 294, 296 (Ark. 1978) (explaining that, where a lien claimant demonstrates it delivered materials to the building site and the building which was supposed to incorporate such materials was constructed, the buyer can still rebut the resulting prima facie case of actual use by showing that the materials "were not so used"). Cluck's testimony remains uncontroverted. Indeed, the district court never found that the entire $376,659.82 worth of Falcon's steel went into the four barges at issue, and Falcon itself essentially conceded that the four barges contained only $65,803.52 of its steel. See Red Br. at 9 ("According to UST, because only $65,803.52 of Falcon's steel is included in the unlaunched barges, Falcon's lien is limited to that amount. Again, this is not the law.").

-14-

Instead of a factual dispute, the parties' disagreement is doctrinal. UST urges, and the district court agreed with this assertion, that the open-account rule of Kizer Lumber Co. v. Mosely, 20 S.W. 409, 410 (Ark. 1892), obviates the need for tracing Falcon's steel to the unfinished barges. In my view, this conclusion is not supported by Arkansas law. Arkansas cases, it is true, rely on the open-account doctrine to extend the time for filing a lien under Ark. Code Ann. § 18-44-117(a)(1) and to dispense with the requirement of filing multiple lien notices for discrete transactions between the same parties on a single project. See Streuli v. Wallin-Dickey & Rich Lumber Co., 302 S.W.2d 522, 523 (1957); Arkansas Foundry Co. v. Am. Portland Cement Co., 75 S.W.2d 387, 391 (1934). The Kizer rule, however, does nothing to alter the basic requirement that a lien claimant show "the materials for which he claims a lien were used in the improvement on which a lien was sought." Del Mack Constr., Inc. v. Owens, 118 S.W.3d 581, 584 (Ark. Ct. App. 2003); Ragsdell v. Gazaway Lumber Co., 668 S.W.2d 60, 61 (Ark. Ct. App. 1984).

Where the debtor rebuts the presumption of actual use which arises by virtue of the supplier's delivery of materials to the construction site, see Cent. Lumber Co. v. Braddock Land & Granite Co., 105 S.W. 583, 584 (Ark. 1907), the claimant must demonstrate actual use in some other way and may not, absent the proper showing, file an undifferentiated materialmen's lien with respect to the entire project. See, e.g., Sebastian Bldg. & Loan Ass'n v. Minten, 27 S.W.2d 1011, 1015 (Ark. 1930) (disallowing the company's materialmen's lien for paint and oil delivered to the site for construction of two houses because the debtor was able to show the painter used his own paint and oil for the job and the amount of paint and oil furnished by the creditor was far in excess of the necessary amount). In this case, the open-account rule of Kizer could perhaps absolve Falcon from the responsibility of apportioning $65,803.52 as between the four barges, but it does not absolve Falcon from having to prove that the four barges indeed contain the entire $376,659.82 worth of its steel.

There are several reasons for courts' insistence on demonstrating actual use as a prerequisite for obtaining a lien. First, the showing of actual use is necessary to give full effect to § 18-44-110(b)(1) of the Arkansas Code Annotated, which gives priority to the materialmen's lien only to the extent the use of the materials enhances the value of the property. Del Mack Construction, Inc., 118 S.W.3d at 584 ("If the rule were otherwise, it would render meaningless . . . section 18-44-110(b)(1) . . . that the materialmen's lien extends only to the enhancement of the value of the improvement for which the materials were used."). Second, straddling the four barges with the full extent of UST's liability to Falcon when they collectively contain less than twenty percent of Falcon's unpaid-for steel could impinge on the rights of other vendors who supplied materials for the barges and must be treated on par with Falcon. Long v. Abeles & Co., 93 S.W. 67, 70 (Ark. 1905) (discussing the rule of parity between materialmen's liens in Arkansas). Third, the majority's approach can prejudice rights of vessel owners like Flowers who could find themselves burdened by materialmen's liens far outweighing the benefits conferred by the materials in question. Cf. Final Report of the Arkansas Task Force on Materialmen's Lien and Bonding Notice Requirements, Bureau of Legislative Research, Little Rock, Ark., Nov. 1994, at 15 (noting the dilemma of landowners who find themselves ambushed by suppliers' liens against their properties and recommending that "at some point within a specified period of time after supplying material, the unpaid supplier should be required to communicate the fact of non-payment directly to the landowner as a prerequisite to enforcing a lien"). Finally, where entry of a single lien could adversely impact other creditors, Arkansas courts have not hesitated to apportion the lien to reflect the amount of the particular creditor's material contained in the property encumbered by the lien. See, e.g., Sebastian Building & Loan Ass'n, 27 S.W.2d at 1015 (reaffirming the practice of not apportioning the amount of the lien as between several houses built pursuant to one contract where there is "nothing to make it inequitable for the . . . materialman to file a single lien on all the houses," but refusing to do so where "other rights are to be affected").

-16-

In sum, because Falcon has not proved actual use to the tune of $376,659.82, I would reverse the judgment of the district court and remand for further proceedings.

_____